# MARTIN LEWIS *vs.* ALLEN KRAMER and EDWARD RAHN.

In order to prove certain matters connected with the protest of a draft, the notary was examined, who said he had no personal knowledge of the facts except from an entry in his handwriting taken down by him from the statement of his clerk, and kept in a book, which record, he said, was correctly made as the facts were stated to him. The clerk, upon being shown the entry, said he had no recollection of the facts in it, but was ready to swear to any thing in the book, because it was his duty and the custom of the office to repeat, on the same day, exactly what took place between himself and the parties on whom he called with bills and notes, to the notary, who copied the statements into the book literally as they were repeated to him. The clerk also said it was his habit to read over the entries the day after they were made to test their correctness, and from his habit he must have read over the entry in question, and would have corrected any error therein if there had been any. HELD:

That this evidence was inadmissible; as the entry of the notary it is mere hearsay, and it cannot be considered the entry of the clerk with full knowledge of the facts, he having no recollection of them, or that he had ever seen the entry.

This entry was not admissible for the purpose of refreshing the recollection of the witnesses, as they both expressly declare they had no recollection or knowledge of the facts but what they derived from the entry.

Where a witness neither recollects the facts nor remembers to have recognised the written statement as true, and the writing was not made by him, his testimony, founded on such writing, is but hearsay, and he can no more

34     v.3

Lewis *vs.* Kramer and Rahn.

give evidence of his inference from what a third person has written, than from what a third person has said.

The defence to an action against the drawee of an unaccepted bill of exchange, was, that it was drawn from a different date from that which the latter had by letter authorised. HELD:

That an instruction that the holder could not recover if the jury believed this fact, was erroneous, because it would authorise a verdict for the defendant though the jury were convinced by the evidence that he had ratified the transaction after the occurrence, with knowledge of all the circumstances.

Where an implied acceptance, based upon an authority to draw, previously given, is relied on, a recovery cannot be had against a party *as acceptor by virtue of such authority*, unless it be proved that the party discounting the bill, before or at the time of so doing, saw or knew of the authority and discounted upon the faith thereof.

Where an authority is actually given, and the person discounting is informed of its existence, but has not seen it, and discounts the paper upon the credit of the authority, the promise to accept is equivalent to an acceptance, provided the authority has been properly complied with.

Prayers, that the holders of a draft cannot recover, though they discounted it upon the faith of an authority, contained in a letter of the drawee, unless the jury find it was discounted in time to effect certain objects disclosed by the letter, are erroneous, because they leave out of view any subsequent ratification by the drawee with knowledge of the circumstances.

Where there is no evidence offered to prove any other promise to accept at the time of discounting, except that contained in a certain letter, a prayer that this was the only such promise at that time should have been granted.

Where the condition on which a party promises to accept has not been complied with, he is not bound to accept by virtue of that promise; and the receiving and retaining a sum raised upon the draft, but less than its amount, will not amount to a waiver of his right of refusal to accept.

But if he receives and retains such less sum with knowledge that the conditions of his promise had not been complied with, but that the sum had been raised upon the draft and sent to him for the purpose of procuring his acceptance, and with the expectation that he would accept, the holders may recover the money so received under the common counts.

If he receives the money with such knowledge and under such circumstances, it matters not what may have been his *intention* in regard to ratifying the act of drawing on him, at least so far as the holder's right to recover under the common counts is concerned.

Receiving from the maker a sum sufficient to meet the note, or taking ample security as indemnity for the same, amounts to a waiver by the endorser of due presentment.

The receiving of a sum less than the amount of the note does not necessarily

Lewis *vs.* Kramer and Rahn.

operate as a waiver, but it may be recovered by the holder against the endorser as money had and received to his use *pro tanto* in discharge of the note.

Where a party gave a written authority to draw a draft upon him "at ninety days from the 10*th of April*," an alteration of this date to the 16*th of April*, without his knowledge, will discharge him from liability as acceptor under such authority.

But this alteration will not, of itself, release him from the claims of the holders against him on the common counts, for money received and retained by him, knowing it to have been the proceeds of the draft.

An instruction that if the jury find that the defendant had knowledge of a certain fact "*when he received the money mentioned in the letter*," &c., then the plaintiffs are entitled to recover, is erroneous, because it *assumes* the fact, that the defendant received the money mentioned in such letter.

No matter how clear and satisfactory the testimony may be for the purpose of establishing any fact the court has no right to assume it to be proved, because, by so doing, the rights of the jury are interfered with.

APPEAL from Baltimore county court.

This was an action of *assumpsit*, brought by the appellees to recover from the appellant, Lewis, $583.09, the amount of a draft drawn upon him by one Thomas S. Robinson, payable to the order of George Howarth ninety days after date, and dated the 16th of April 1849. The declaration contained the common money counts, and a special count charging the appellant as *acceptor*. The plea was *non assumpsit*.

*1st Exception.* The plaintiffs offered testimony, taken under a commission issued to Pittsburg, in substance, as follows: Robinson, the drawer of the draft, owed Lewis a note for $583.09, due April 16th 1849, and being unable to pay it as well as a previous one of April 6th, which had been protested, he, on the 7th of April, remitted Lewis $400 in cash, and a note for $400, endorsed by George Howarth at three months from the 16th of April, by way of renewing the note due April 16th. Lewis replied by letter dated the 10th of April 1849, in which he acknowledges Robinson's letter of the 7th inst., expresses surprise at the protest of the latter's note due the 6th inst.; states that he had credited the $400 on the note due the 6th, and that he would then draw on him for the balance. This letter then proceeds:—"We are not pleased

with the idea of having to receive part of the note due us on the 16th next. It is a request we did not expect from you, and becomes so much harder, as of course you must know, that after having been protested once, your paper hereafter is perfectly useless to us. In fact, we should injure ourselves by offering it for discount. It is too late to withdraw the note now, and the only way to do it is this: On the day that it is due, pay the note by a draft on us for the whole amount of the note due, $583.09, ninety days from the 16th April, and we will accept it. We will retain the note of $400, sent us as part settlement, and for the difference between the note and the draft, we will likely to-day draw on you at sight. This is the best we can do on both sides. It gives you the time required, by getting the draft on us discounted, and it saves us from the outlay of money."

The note due on the 16th was not paid, but was on that day protested and returned to Lewis to be paid. Robinson, however, on the 16th of April, drew the draft in controversy which the plaintiffs discounted on the 18th, giving him therefor $556.81, of which sum he remitted to Lewis, by letter of the 18th of April, $550, in the form of a certificate of deposit on a Pittsburg bank, and promised to pay the balance in a few days. In this letter Robinson states, that he had followed Lewis' "instructions to the letter in respect to the note due," complains of the enormous price he had to pay to get the note discounted;" other portions of this letter are set out in the opinion of this court, To this letter Lewis replied by letter of the 21st of April, in which he says: "We received to-day your favor of 18th inst., enclosing $550 on account of your note due us on the 16th inst. We wrote you before your note became due, that to save you from protest we would accept for you $583.09, at ninety days. We did so in the supposition that your credit was dear to you as it ought to be to every merchant. But as we find you care no more about it than to suffer another protest, we see no further reason for endeavoring to sustain your standing, and we therefore have not, nor shall we accept your draft." It was further proved,

that the letter of Lewis, of the 10th of April, was shown to the plaintiffs, but whether it was before or after the date of the draft in controversy, the witness could not tell, but believed it was before. That plaintiffs, on the 16th of April, sent a telegraphic despatch to their correspondents in Baltimore, inquiring "What rate can you sell Lewis' acceptance $600, ninety days?" And on the next day received for reply, "One per cent. per month." The draft was presented to Lewis on the 21st of April, and he refused to accept it; and it was further proved that Robinson, the drawer, had left the country, and that Lewis retained the $550, and applied it to Robinson's indebtedness to him on the note due the 16th of April 1849, which it was not sufficient to cover.

The defendant, Lewis, then gave evidence, that his letter of the 10th of April had been altered, by inserting "16*th*," instead of "10*th*," in the following passage, which originally read as follows: "On the day that it is due pay the note by a draft on us for the whole amount of the note due, $583.09, ninety days from *the* 10*th April*, and we will accept it," and then offered the usury act of Pennsylvania of 1722. ch. 248. He also offered a letter from the plaintiffs to him, dated April 24th, 1849, in which they express surprise that he had refused to accept the draft, and after referring to his letter to Robinson, state, "we have possession of your letter." Also a letter of his own in reply, dated April 30th, 1849, in which he explains his transactions with Robinson as above stated, and states, that it was for the purpose of saving Robinson's credit that he agreed to his request, and that his object for accepting the draft was made perfectly null by Robinson's permitting the note to be protested, &c. He also offered Robinson's letter of the 18th of April, already referred to, and also the following telegraphic despatch from Robinson to himself, dated April 18th, 1849: "To-day's mail contains for you $550."

The plaintiffs then, for the purpose of proving that the defendant had knowledge of the date and contents of the draft in controversy, at the time he received the remittance of $550 from

Robinson, called Joseph B. Williams, a notary public, who being asked his knowledge of the matter, stated he had none, except what he derived from a memorandum contained in a book, which he produced, to the effect, that the draft was presented to Lewis and acceptance demanded, and the answer given "I decline accepting it;" and noted for non-acceptance on the 21st of April 1849. The memorandum, he said, was in his handwriting, taken down from the statement of the clerk, in whose district Lewis resided; that he had no personal knowledge of the truth of the memorandum, other than that derived from the statement of his clerk, but that the record in his book was correctly made as the facts were stated to him. The plaintiffs then called Latimer, the clerk of Williams, who, upon being shown the memorandum, said he had no recollection of the facts therein contained, but was ready to swear to any thing contained in said book. He said that it was his duty and the custom of the office, to repeat to Mr. Williams exactly what took place between himself, (the witness,) and the parties on whom he called with bills or notes, on the same day of his so calling on them, and that Mr. Williams copied these conversations down on the memorandum book aforesaid, literally as they were stated to him. The witness further stated, that it was his habit to read the said entries over the day after they were made, in order to test their correctness. From these facts, he said, he was prepared to swear to whatever was in the book. He knew that he could not have stated to Mr. Williams any thing but what was true, and that Mr. Williams would not have written down any thing .but what was stated to him. Besides, from his habit, he knew he must have read over the statement the day after it was written, and doing so he would have seen and corrected any error therein, had there been any. These, he said, were the grounds of his certainty. The defendant objected to the admissibility of this testimony for the purpose aforesaid, but the court, (LE GRAND, A. J.,) overruled the objection, and allowed the testimony to go to the jury, to which overruling and permission the defendant excepted.

*2nd Exception.*   The defendant then submitted eleven prayers and instructions to the jury, in substance as follows:

1.   If the jury believe, from the evidence, that the draft which Lewis authorised Robinson to draw was to be at ninety days from the 10th, and not the 16th of April, the plaintiffs are not entitled to recover.

2.   In order to recover, in this case, against defendant as acceptor, through any authority to draw contained in his letter of April 10th, the plaintiffs must first satisfy the jury from the evidence, that they not only saw the letter or knew its contents, prior to discounting the bill in controversy, but that they also discounted the bill upon the faith and credit of the said letter.

3.   Even if the plaintiffs did discount the bill upon the faith and credit of said letter, they are still not entitled to recover, unless the jury further find that said bill was so discounted to pay Robinson's note for $583.09 in Pittsburg, on the day it became due, so that it might not be dishonored.

4.   Even if plaintiffs did discount the bill upon the faith and credit of the letter aforesaid, they are not entitled to recover, if the jury find that they did not discount it until after the 16th of April 1849, the day that Robinson's note became due, nor until it was too late, by the proceeds of the discount, to pay said note at its maturity, and prevent its being protested.

5.   (This prayer is set out in full in the opinion of this court.)

6.   If the jury believe that Lewis' authority to Robinson, to draw upon him, was given for certain purposes and on certain conditions only, which were fully disclosed upon the face of the letter of April 10th, and that plaintiffs, before discounting the draft, had that letter before them, and did nevertheless discount it, with knowledge that it was too late, and impossible to carry out said purposes, and perform said conditions, then they are not entitled to recover, unless defendant subsequently waived his right of objection thereto.

7.   If the jury believe that plaintiffs could not, from said

letter, have had notice of the authority to draw, without notice, also, of the conditions with which such authority was coupled, they are not entitled to recover, unless they can show that those conditions were complied with, or were subsequently waived, or their non-performance consented to by defendant.

8. If the jury believe, that at the time Lewis received from Robinson the certificate of deposit mentioned in the evidence, Robinson was his debtor to more than the amount thereof, upon a note then due and unpaid; and shall further believe, that he applied the proceeds of said certificate to the payment of said debt, and did not intend, by said application, to ratify the act of drawing upon him by Robinson, then plaintiffs are not entitled to recover.

9. If the jury believe, that plaintiffs discounted said draft usuriously, for more than six per cent. *per annum*, then, by the laws of Pennsylvania, in force at the time, the taking of more than six per cent. interest *per annum* was illegal and forbidden, and the plaintiffs are not entitled to recover, if the jury find that the law of Pennsylvania offered in evidence, is a law of that State, in force at the time of discounting the draft.

10. (This prayer is also fully set forth in the opinion of this court.)

11. If the jury believe that the letter of the 10th April was, by knowledge or consent of plaintiffs, altered from the 10th to 16th April, then the defendant is not liable for the acceptance of the draft, nor for any adoption or ratification thereof, unless, before such ratification, the fact of such alteration had been previously made known to him.

The court rejected all said prayers, but the eleventh, and by way of modification of the first and second, gave the following instruction:—But if the jury find that defendant had knowledge of the fact, that the draft was drawn payable ninety days after the 16th of April 1849, and also that he had such knowledge when he received the sum of money mentioned in the letter of Robinson to him, of the 18th of April 1849, that such money was of the proceeds of the sale to the plaintiffs

of the draft sued on, then plaintiffs are entitled to recover, if the jury shall find that defendant wrote the letter of the 10th of April 1849, and that it was shown to plaintiffs before they made such purchase, and that said purchase was made on the faith of such letter.

To all and each of which refusals to grant said prayers, and to the instruction so given by the court, the defendant excepted, and the verdict and judgment being against him he appealed.

The cause was argued before Eccleston, Mason and Tuck, J.

*Charles H. Key* for the appellant.

1st. The testimony of Williams, the notary public, and Latimer, his clerk, was inadmissible, neither party professing to have any recollection of the matter—the principal speaking from a memorandum made from his clerk's statement, and the clerk speaking from his principal's memorandum. 1 *Greenlf. on Ev.*, secs. 436, 437. *Owings vs. Piet and Low,* 5 *G. & J.*, 137. 1 *Smith's Leading Cases,* 43 *Law Lib.*, 227. *Flack vs. Green,* 3 *G. & J.*, 480. 8 *G. & J.*, 424, *Pocock vs. Hendricks.*

2nd. In order to recover against the appellant, on the theory of an implied acceptance, it was indispensable for the appellees to satisfy the jury that they saw the appellant's letter of authority, prior to discounting Robinson's draft, and that they discounted on the faith of that letter. The refusal of the court to grant the first and second prayers, involving this proposition, was erroneous. *Story on Bills,* sec. 249. *Coolidge vs. Payson,* 2 *Wheat.*, 66. The declaration contains two counts; the first charges the defendant as acceptor, and the second are the common counts. Upon the latter he is only responsible for the amount of money he has received. The prayers are based on the first count, hence all argument on the doctrine, *ex æquo et bono,* is foreign to the case, being applicable only to the common counts.

3rd. The construction of the letter of authority was a matter for the court, and it erred in refusing to grant the fifth prayer, which merely asked the court to say, that the promise to accept, made in the letter, was a conditional one. *Ferris vs. Walsh*, 5 *H. & J.*, 310. *Osgood vs. Lewis*, 2 *H. & G.*, 495. *Hall vs. Hall*, 6 *G. & J.*, 408. *Key vs. Parnham*, 6 *H. & J.*, 418. *Ringgold vs. Ringgold*, 1 *H. & G.*, 74.

4th. In order to enforce against the appellant any promise to accept, which his letter contained or implied, it was incumbent on the appellees to show, that they not only discounted on the faith of that promise, but under the circumstances and conditions upon which the promise was made dependent: The appellant was entitled to an instruction to this effect, without regard to the question of subsequent waiver or ratification: and the court erred in refusing the third and fourth prayers, which asked such an instruction. *Schimmelpenninch vs. Bayard*, 1 *Pet.*, 290. *Parsons vs. Armor, &c.*, 3 *Pet.*, 413, 429. *Atwood vs. Munnings*, 7 *Barn. & Cres.*, 278 *Chitty on Bills*, 29, 30. An authority must be strictly pursued. *Banorgee vs. Hovey*, 5 *Mass.*, 23. An unconditional written promise to accept may be restricted by a verbal agreement as to the time at which the acceptance is to be made. *Storer vs. Logan*, 9 *Mass.*, 55. *Tate vs. Evans*, 7 *Missouri*, 419. *Batty vs. Carswell*, 2 *Johns. Rep.*, 48.

5th. If the third and fourth prayers were open to any objection it was solely on the ground of their disregarding the question of subsequent waiver or ratification. This objection is removed in the sixth and seventh prayers, which are put subject to the finding of the jury on the question of subsequent ratification, and should, therefore, have been granted. The rejection of the fifth prayer, which left the construction of the contract to the court, and of the sixth and seventh, which gave it to the jury, amounted to taking its construction from both court and jury, and, in fact, to declaring the appellant responsible, without any reference to the engagement which created his responsibility. *Bell vs. Cunningham*, 3 *Pet.*, 81.  6 *Cowen*, 435, *Bank of Cape Fear vs. Gowez*.

6th. Robinson owed the appellant more than $550 when the certificate of deposit for that sum reached him in Baltimore, and if the draft on which this money was raised was drawn under circumstances which did not oblige the appellant to accept it, he incurred no obligation to accept from the mere fact of receiving and appropriating the $550. On the contrary, he had a perfect right to apply it to Robinson's debt, like any other money of Robinson's coming to his hands. His knowledge of the mode in which it had been obtained was but a knowledge that it had been obtained in a mode which did not bind him to accept or pay the draft, and his application of it to Robinson's debt, with such knowledge, no more bound him to accept or pay the draft, than if he had not possessed the knowledge—unless the jury believed he intended the receipt and application of it to Robinson's debt as a ratification of Robinson's action. The eighth prayer was, therefore, erroneously rejected. The intent constitutes the ratification and it was for the jury to find it. *Parsons vs. Armor, &c.*, 3 *Pet.*, 413, 429. *Bell vs. Cunningham*, 3 *Pet.*, 81. *Horsfall vs. Fauntleroy*, 10 *Barn. & Cres.*, 755. *Hortons vs. Townes*, 6 *Leigh*, 47. *Fletcher vs. Dysart*, 9 *B. Monroe*, 413.

7th. The discounting was usurious in Pennsylvania, and the court should have granted the ninth prayer, which assails, on that ground, the right of the appellees to sue. *Act of Assembly of Pa.*, 1722 '3, *ch.* 248. *Tyson vs. Rickard*, 3 *H. & J.*, 109. *DeBegnis vs. Armistead*, 10 *Bing.*, 107. 1 *Smith's Leading Cases*, 285. *Andrews vs. Pond*, 13 *Pet.*, 65, 77, 78. The appellees purchased the draft at one-and-a-half per cent. per month, which would make their profit, *per annum*, enormously usurious.

8th. The alteration of the date, in the letter of authority, if made by Robinson or the appellees, without the knowledge and consent of the appellant, *prima facie* destroyed the right of the appellees to recover; and the subsequent receipt by the appellant of the $550 remitted him by Robinson, did not affect that result, unless at the time of such receipt Lewis knew of the alteration. This proposition is asserted by the tenth prayer, which the court, therefore, erred in rejecting. *Owings*

vs. Hull, 9 Pet., 629.   1 Smith's Leading Cases, 458, et seq.
43 Law Lib., 595, 596.   Batty vs. Carswell, 2 Johns. Rep.,
48.   Doe vs. Palmer, 6 Eng. Law and Equity Rep., 155.

9th. The court's instruction is erroneous, because it treats
the receipt of the certificate of deposit by Lewis as an absolute
ratification in law of the previous unauthorised acts of Robinson;
because it throws out of view the question of usury; because
there was no evidence in the case from which the jury could
find Lewis to have had a knowledge of the date of the draft,
and the source from which the certificate of 'deposit had been
derived, when he received and applied it to Robinson's debt;
because it assumes the receipt of the money by Lewis from
Robinson as a fact, instead of leaving it to the jury to find it;
and because it assumes that plaintiffs *purchased* the draft in-
stead of *discounting* it, of which there is no evidence, and
which should have been left to the jury to find if there had
been evidence.

*Robert J. Brent* for the appellees,

The plaintiffs' *nar* contains a special count against the de-
fendant, *as acceptor*, and also the common money counts.
The plaintiffs proved, that they were shown the letter of the
10th April 1849, but witness could not say whether it was
before or after the date of the draft, though he believed it *was
before;* and, in addition, proved, that on the *16th April, two
days* before the discounting of the draft, they telegraphed to
Baltimore, to know "at what rate they could sell the defend-
ant's acceptance for $600 at ninety days," and on the 17th
April, were informed that it could be done at "one per cent.
per month."   Now, as the amount inquired about is $600,
just $14.91 over the amount *authorised to be drawn for* in the
letter of *the 10th April,* and as *the time* is "*ninety days,*" *the
time specified* in the letter, it results from this inquiry about
the credit of *the writer of that* letter, for a *round sum* a little
over the amount stated in his letter, and at the exact time
*authorised* in that letter, that the plaintiffs were, on the *16th
April,* apprised of the contents of that letter, and were going

Lewis *vs.* Kramer and Rahn.

to act on the *faith* of the authority therein contained, if they were satisfied with the credit of the writer.

I assume, therefore, that there was abundant evidence before the jury to establish, *first*, a *scienter* in the plaintiffs, of the letter of the 10*th April*, before they discounted the draft of the 18*th April*; *secondly*, that the discount was made on the faith of the promise of Lewis to accept Robinson's draft at ninety days, for $583.09. The letter of the 10*th April* shows, that Lewis fully authorised Robinson to pay *his note*, *due* on the 16*th April*, by drawing on that day on Lewis, at *ninety days*, for the full amount of the note, $583.09, and that Lewis *expressly promised* to accept such a draft.

·I maintain, therefore, that the drawing of a draft on the 18th April, and the discounting of that draft on *that day*, on the faith of this letter, and *the purposes declared in* it, could not be considered as a deviation from the spirit and intent of the authority given by Lewis, and that it would be a narrow construction of the *power given and the objects* declared, to require the draft to be discounted on the day when Robinson's note fell due.

But suppose the drawing and discounting of this draft on the 18th April, was an excess of authority, let us see if the defendant has pursued that course which common justice required in order to avail himself of such defence, or whether he is not seeking to perpetrate a fraud on the plaintiffs, by *coolly* pocketing *their money, the fruits* of his debtors' excess of authority, with a full knowledge of *how it was obtained*, and then attempting to repudiate that very agency by which he reaps *a golden harvest*, in violation of the maxim, that "no one shall take advantage of his own wrong."

Now what are the facts? On the 18th April, the plaintiffs gave their check for the proceeds of the draft to the drawer, Robinson. On the 17*th April*, Robinson's protested note for $583.09 was returned to the Union Bank of Maryland. On the 18th April, (the day of discounting the draft,) Robinson deposited $550 in Bank of Pittsburg, and obtained a certificate of deposit, which Lewis received.

On the 21st April, the defendant acknowledges by his letter, that he had received the $550, per certificate of deposit, *and that* it was stated in the letter of Robinson *to be on account* of his note, due on the 16th April, and that the defendant had not accepted Robinson's draft; and, moreover, the defendant offered Robinson's letter, of the 18th of April, which fully apprised him of all the facts. Here then is a distinct confession by the defendant, that *with a full knowledge* of the draft drawn on the 18*th April*, and of the remittance of $550 on account of the note due on 16th April, and, of course, with knowledge that Robinson had, on the 18th April, raised the $550 by his draft on Lewis, and on the express or implied assurance that Lewis would accept that draft, he, instead of repudiating the draft and its proceeds, thus obtained for his benefit, adopts the extraordinary and indefensible course of pocketing the *proceeds* of Robinson's assumed authority, while he denies *the authority*.

I submit, that in the absence of any previous authority or request, such as contained in defendant's letter of the 10th April, this would amount to a legal ratification of Robinson's unauthorised act, because if A, desirous of paying his creditor B, should draw an unauthorised draft at ninety days on B, which he persuades C to discount, and then informs B, by letter, of his draft, and remits the proceeds, or any portion of the proceeds, to B, in the expectation that B will accept the draft, and B, with knowledge of all these facts, should apply the proceeds of this unauthorised draft to the credit of A, his debtor, the law would regard such conduct in B as equivalent to a previous authority to draw, because such is always the effect of a subsequent ratification of a voidable act. It would be taking advantage of his own wrong to allow B, in such a case, to plead or set up the want of a previous authority. He has his election to do so, by returning the fruits of the act which he repudiates, but if he knowingly appropriates those proceeds, or any part of them, he is bound, in morals and in law, to admit the question of authority by a sort of legal estoppel.

It will be further seen that Lewis applied this $550 towards the repayment of what he had been compelled to pay the day before, to take up the note of Robinson returned protested, thus showing that Lewis himself applied the proceeds of this draft to his original object, of avoiding *an outlay* of money, by having to take up the note due 16th April. Here then we have a previous express authority to draw a draft such as was drawn, and if not a previous authority, there is a clear subsequent recognition, or ratification of the authority exercised by Robinson, which is legally equivalent for all purposes, by relation to a previous authority. Something was proved by defendant about the original writing in his letter of the 10th April, having been altered from "the 10th April" to "the 16th April," but, consistently with that evidence, it might have been altered by defendant or his clerk, and indeed ought to have been so altered, to make the date of the draft therein authorised correspond to the date of the maturity of the note which it was to pay. *Cui bono* antedate the draft to the 10th?

The first exception raises the simple question, whether the testimony of the notary public, J. B. Williams, and his clerk, Latimer, as to entries made in the *regular course* of their official business, were not competent to show that on the 21st April, the draft was presented to Lewis and refused acceptance by him, in order to show that he knew of this draft when he received and applied to his use, the remittance of $550? But this evidence was not prejudicial to the defendant, as his own admitted letter of the same 21st April shows, that he had on that day received and applied to his own use the certificate for $550, and had also on that day refused to accept the draft. Therefore the offered evidence was only to prove what the defendant had himself confessed in his own admitted letter. If therefore there was error in admitting the evidence, it was not prejudicial to the defendant. See on this point 5 *G. & J.*, 223. *Bosley vs. Ches. Ins. Co.*, 3 *G. & J.*, 472, '3. *Greenleaf vs. Birth*, 5 *Pet.*, 134.

But this evidence being relevant was clearly legal, although

the notary and his clerk could not recollect the transaction, because made *bona fide* in course of official business. 4 *H. & J.*, 241, and 4 *G. & J.*, 273, *Naylor vs. Semmes.* 19 *Johns.*, 347. 3 *and* 4 *Camp.*, 193. *Burckmyer and Adams, vs. White-ford*, 6 *Gill*, 5, 16. *Smith's Leading Cases*, 43 *Law Lib.*, 225, '6, '7. 1 *Greenleaf's Evidence*, secs. 115, '20. *Toosey vs. Williams*, 1 *Mood. and Malk.*, 129. 7 *Gill*, 223. 12 *Wheat.*, 69, 70.

The second exception is on the prayers of defendant, refused by the court.

1st. The first prayer erroneously relies on the assumed fact, that the draft was authorised at ninety days from the 10th April, as a conclusive defence to the action.

2nd. The second prayer assumes, that if the plaintiffs did not know of defendant's letter of 10th April, and did not discount on the faith of that letter, the plaintiffs cannot recover against defendant as acceptor, through any authority to draw, contained in that letter. It was rightly refused as calculated to mislead the jury, because, although plaintiffs may not have seen or known of that letter, yet, if they were assured by Robinson that he had authority from Lewis to draw, and the plaintiffs relying on this statement of Robinson, discounted the draft in the belief that he was authorised in fact, still the subsequent receipt of the proceeds of that draft, *with full knowledge of the facts*, would be a ratification of the draft, and the *letter*, though not seen by plaintiffs, would still be evidence of an *original authority* to Robinson, and of the subsequent waiver by defendant of some of the restrictions on the original authority conferred by that letter.

It has been repeatedly held, that a promise to accept a bill not *in esse*, may be declared on as an actual acceptance. 2 *Wendell*, 549. 2 *McLean*, 463, and cases there cited.

But that is where the plaintiff stands alone on a promise to accept. Here we stand on the previous promise, coupled with a subsequent ratification of the act done, by receiving its proceeds under a full knowledge of all the facts, which makes our case far stronger than any case on a mere *promise*

Lewis *vs.* Kramer and Rahn.

*to accept.* Subsequent ratification is equal to a previous authority. 9 *Cranch*, 156, 159, 161. 9 *Pet.*, 629. 3 *Pet.*, 80. 8 *G. & J..* 323, '4. 2 *Wendell*, 549, 550.

So that if the defendant could be held as acceptor, independent of the plaintiffs' seeing the *letter of 10th April,* or if that letter, coupled with the other proof, was evidence "of *any authority,*" the prayer was rightfully refused.

The third, fourth, fifth, sixth, seventh, tenth and eleventh, were all correctly overruled, because they seek to bar the recovery, by confining the attention of the jury to the letter of the 10th April, and its supposed alteration, leaving out of view the subsequent ratification of the act of Robinson, by a receipt of the money, with *full knowledge* of how and on what assurances it was obtained.

The seventh prayer is moreover liable to the objection, that it leaves to the jury the question *of waiver of conditions,* which is a legal question for the court to decide on facts found or supposed.

The eighth prayer assumes the strange proposition, that the question of Lewis' ratification depends on his own intention, rather than upon an implication of law arising from his receipt of the money, with knowledge of all the facts.

But each of these prayers look to the question of acceptance by Lewis, and seek to bar the recovery by negativing the question of acceptance, yet this declaration contains the *usual money counts,* and the plaintiffs had a right, independent of the question of acceptance, to recover, *ex æquo et bono,* their money obtained by the defendant, with a full knowledge of Robinson's want of authority to draw. That it was clearly a fraud, under such circumstances, to receive and apply to his own use, money obtained by an authorised draft on him, and which he knew was obtained on the faith that he would accept, is one of those plain propositions of common sense and common justice, which requires nothing but its simple statement. *Assumpsit* for money had and received, is remedial as a bill in equity. *Moses vs. Macferlan,* 2 *Burr.*, 1012. *Straton vs. Rastall,* 2 *Term Rep.,* 370. *Kennedy vs. Ins.*

*Co.*, 3 *H. & J.*, 370. *Murphy vs. Barron*, 1 *H. & G.*, 265. There is sufficient privity between the plaintiffs and defendant. *Penn vs. Flack*, 3 *G. & J.*, 375. It only remains to consider the ninth prayer, in relation to the usury laws of Pennsylvania. First, being penal, they are to be strictly and literally construed, and they only apply to loans for *one year*, and therefore not to a loan for ninety days, and these laws only apply where the lender actually *takes* the illegal interest. Secondly, they only forfeit the debt *on conviction*, by action of *debt, information, &c.*, and the contract is not *avoided*, as uniformly held by the courts of Pennsylvania. *Wycoff vs. Longhead*, 2 *Dallas*, 92. *Turner vs. Calvert*, 12 *Serg. and Rawle*, 47. But the prayer is at any rate vicious, as it charges the plaintiffs with usury as matter of law, upon the fact of taking more than six per cent. per annum, whereas the intent must be found to take more. *Duvall vs. Farmers Bank*, 7 *G. & J.*, 44. It might be that more was taken by mistake, or *for exchange*. Again, was it not error to leave, as a question of fact to the jury, the finding of the laws of Pennsylvania, at least since the act of Maryland of 1845, ch. 89, which clearly makes the court judge of the genuineness of the foreign law?

*S. Teackle Wallis*, for the appellant, in reply.

The imputations upon Lewis' conduct, by the counsel, are unjust. Lewis was to retain the $400 note for the purpose of meeting the draft which he had authorised to be drawn by his letter of the 10th of April. The credit of Robinson would have been restored by the payment of the note due on the 16th, which was discounted by the same bank at which the previous note had been discounted and protested. The whole object of Lewis was to save the credit of his customer, Robinson, in bank. But whatever may have been the motive, the authority given was only to draw the draft on the 10th of April, and not on the 16th. This authority must be strictly and substantially followed. There was no authority to hawk the paper about the streets of Pittsburg among the brokers

there—the direction was *to pay* the note when it became due. Pay it where? In bank, of course. His credit in the bank of Pittsburg would be considered good from the fact that the note was discounted in the Union Bank of Maryland. Robinson never applied to the bank to pay the note by the draft as he was directed to do; this is proved by the testimony.

The plaintiffs discounted the draft after the note was protested, as is shown by the telegraph despatch which was not sent until after the banking hour was over. It was perfectly plain why Lewis wanted the draft dated the 10th, as there would be three days grace on the draft, and three days for the transmission of funds from Pittsburg to Baltimore.

The telegraph despatch does not ask whether Lewis' acceptance for ninety days was good, but for what it could be sold for, evidently intending a speculation on the draft. They sold it at the rate of about 121 per cent. per annum. They were further indemnified by the endorsement of Howarth. This shows that they relied on Robinson and Howarth, and the premium received as a reward for their speculation, and not on Lewis' acceptance.

The draft was altered from the 10th to the 16th, and the ratification must be with a full knowledge of all the previous facts. 9 *Peters*, 629. It became then necessary to show, that Lewis knew of the alteration of the draft, and this proof was attempted to be shown by the testimony of the notary and his clerk.

The purpose of this proof was to show that Lewis had knowledge of the date and contents of the draft. There is a class of cases in which the *custom* of banks and notaries are admissible for the purpose of proving the commercial fact of demand or notice. But that is not the case here, where the offer and object is to prove a fact *in pais.* Williams is asked if he has any personal knowledge of the fact, and he answers, none whatever; but he exhibits a memorandum book in which he says he put down what his clerk said. An entry of a fact, not within his own knowledge, and of which he has no recollection, put down upon the hearsay statement of the clerk, is

not evidence. No case can be found in which such an entry has been allowed as evidence. The party making the entry must have had competent knowledge of the fact. 1 *Greenleaf on Ev.,* sec. 115. *29th Maine Rep.,* 119, *Dow vs. Sawyer. Latimer* says he has no recollection of the fact, but seems ready to swear to any thing in the memorandum. The principal speaks from a memorandum, made from his clerk's statement, and the clerk speaks from his principal's memorandum. The custom here referred to in 4 *G. & J.,* 276, 277, the court say would not be binding on third parties. The case of *Bell vs. Hagerstown Bank,* 7 *Gill,* 223, was one of that class of cases in which the custom of banks was admissible to prove the commercial fact of notice, and is not applicable here. This was a case, too, in which the custom of the bank was fortified by the absolute recollections of the witnesses. 8 *G. & J.,* 424, *Pocock vs. Hendricks,* 426, 427, 431, decides that such evidence is inadmissible. Even if Williams were dead, and it could be shown that the entries were not made from his own knowledge, the *prima facie* inference from the fact that the book was his, would be done away with.

There are two counts—one to fix the defendant as acceptor, the other to fix him under the common money counts.

The first point is, whether the authority of the letter was followed or not? It is conceded, that Lewis could have refused to accept. Whenever a special authority is given to an agent, he must carry it out strictly and substantially. *Story on Agency,* sec. 165. 1 *Peters,* 290. An authority to draw must be strictly and substantially followed. A party discounting on such an authority must see and know it, and is bound, at his own risk, to take notice of the extent of that authority.

The subsequent acts of Lewis cannot make him responsible, if the plaintiffs drew the draft not relying upon his acceptance nor upon his authority to draw, but solely upon the faith of Robinson and Howarth. Such a proposition cannot be sustained. They must show that they discounted the draft upon Lewis' faith and credit, and not upon the faith and credit of Robinson and Howarth. There is no proof of this, ex-

cept the telegraph despatch, asking for what Lewis' accep-tance for $600 could be sold for, and this, at most, is vague and uncertain.

Before you can treat the acts of Lewis as a ratification, you must show that he intended to ratify. Ratification is not an absolute conclusion of law. Robinson is not simply the agent of Lewis, but he is also his debtor. In remitting money to Lewis he may therefore act in either of these capacities; there can then be no such absolute conclusion of law that he remit-ted the money as agent. The transmission of the money here was a payment of the debt, and it was therefore a question to be submitted to the jury whether it was a ratification or not. *Story on Agency*, sec. 253. 1 *Pet.*, 290. 6 *Leigh*, 47. These cases treat the question of ratification as a mere pre-sumption of fact, to be left to the jury. 3 *Peters*, 81, *Bell vs. Cunningham*. Lewis was ignorant that his instructions had not been complied with. The letter of Robinson on the sub-ject, informs him that his instructions had been complied with to the letter. These facts the jury should have had before them in order to determine whether the acts of ratification were intended to be such or not. But the court below says, it was an absolute conclusion of law.

The second prayer applies itself exclusively to the first count, charging the defendant as acceptor, and contains a proposition of law which would seem incontestible. It is justified by the principles laid down by the most eminent tri-bunals in the cases already cited. The only objection urged to it is, that it leaves out the consideration of "subsequent ratification." But had not the defendant the right to divide the propositions of law as to previous authority and subsequent ratification. The two propositions are distinct, and surely they had the right to ask any instruction which would not mislead the jury.

Third *prayer* and fourth *prayer* are involved in the sixth and seventh. The fifth prayer involves two propositions:— 1st. That there was no authority to draw, except the letter of the 10th of April; and 2nd, that this authority was a condi-

tional one.    These propositions are fully sustained by the authorities cited by my colleague under the third point.

Sixth and seventh.    There is no defect in these prayers. See authorities cited by my colleague under his fifth *point*. The only objection which might be urged was, that it left to the jury the construction of a written instrument, but this was done in 14 *Peters*, 493.

The eighth prayer has already been discussed.

Ninth *prayer*, on the question of usury, is *abandoned* under the decisions cited by the other side in the Supreme Court of Pennsylvania.

The prayer granted by the court leaves out of view very many material points, and withdraws material facts from the consideration of the jury, all of which are fully enumerated under our ninth point.

ECCLESTON, J., delivered the opinion of this court.

The admission of the testimony of J. B. Williams, a notary public, and of Latimer, his clerk, is the first ground of exception presented by this appeal.

Williams had no knowledge of the matter except what he derived from a memorandum contained in a book produced by him.    The memorandum was in his handwriting, taken down from the statement of the clerk.    He had no personal knowledge of the truth of the memorandum, but says the record or entry in the book was correctly made as the facts were stated to him by the clerk.    Upon seeing the memorandum, Latimer said he had no recollection of the facts contained therein, but was ready to swear to any thing contained in that book.    He said it was his duty and the custom of the office, to repeat to Mr. Williams exactly what took place between himself (the witness) and the parties on whom he called with bills or notes, on the day of his calling upon them, and Williams copied these conversations down on the memorandum book literally, as they were stated to him.    Latimer also said, it was his habit to read the entries over, the day after they were made, to test their correctness.    From these facts he

said he was prepared to swear to whatever was in the book, He knew that he could not have stated to Mr. Williams any thing but the truth, and that Mr. Williams would have written down nothing but what was stated to him. He further said, that from his habit, he knew he must have read over the statement the day after it was written, and doing so, he would have seen and corrected any error therein had there been any. These, he stated, were the grounds of his certainty.

This evidence is claimed to be admissible, because the entry was made in the course of official business. But if for no other reason, it is defective on account of the fact that the transaction stated in the book does not appear to be a matter within the knowledge of Williams, the writer of the statement. And we are not even permitted to draw the inference, that it was known to him personally because his duty required him to know it, for it distinctly appears that Williams made the entry upon information given him by the clerk. As the entry of the principal, it is clearly nothing more than hearsay. And it cannot be considered as an entry of the clerk, having full knowledge of the demand. It is true, he says it was his habit to read over such statements the day after they were made, for the purpose of testing their correctness, and from that habit he is very confident he must have read over the one now under consideration. But after seeing the memorandum, he had no recollection of the facts stated therein; nor does he testify to having any recollection of his ever having seen the statement, but bases his willingness to swear to its truth, upon the habit of the office, his own and his principal's correctness. If Williams had made the demand, or if the clerk had made the entry, a very different question would be presented, but it is one which we, at present, have nothing to do with.

None of the authorities which have been referred to, in our opinion, sanction the propriety of admitting in evidence this memorandum as an entry, made in the course of professional employment, or on any other ground.

The case of *Naylor vs. Semmes*, 4 *G. & J.*, 273, can have

no material influence upon the present question.  That was a suit between a sheriff and his deputy.  The usage of the office in regard to returns was relied upon: and on page 276 the court held, that it was competent for the sheriff and his deputies to establish such a practice for the regulation of their own official conduct, but that the usage would not bind third parties.

It can scarcely be necessary for us to say, this memorandum was not properly admitted for the purpose of refreshing the recollection of the witnesses, for they both unequivocally declare, that they have no recollection or knowledge of the transaction but what they derived from the entry.  Williams could have no recollection of the facts except as being hearsay, received by him from the clerk, and if he could remember them perfectly as detailed to him, he would not be allowed to give them in evidence.  The clerk's knowledge at the time of testifying was predicated exclusively upon the entry, which he did not make, or recognise as true, except from the habit of the office, and the correctness of himself and his principal.  And in the 436th sec. of 1 *Greenl. on Ev.*, it is said: "But where the witness neither recollects the fact, nor remembers to have recognised the written statement as true, and the writing was not made by him, his testimony, so far as it is founded upon the written paper, is but hearsay, and a witness can no more be permitted to give evidence of his inference from what a third person has written than from what a third person has said."

From the reasons stated we cannot agree with the court below on the first bill of exceptions.

The defendant's first prayer, set forth in the second bill of exceptions, was correctly refused by the court.  If it had been granted the jury would have been fully authorised to have given a verdict in favor of the defendant, because they believed the draft which Lewis gave authority for Robinson to draw, was to have been at ninety days from the 10th instead of the 16th of April, although they were convinced by the evidence, that Lewis had ratified the transaction subse-

quently to its occurrence, and with a knowledge of all the circumstances.

The proposition contained in the second prayer is sustained by the decision in 2 *Wheat.*, 66, *Coolidge vs. Payson*, and should have been granted. Where an implied acceptance is relied on as based upon an authority to draw, previously given, a recovery cannot be had against the defendant, *as acceptor, by virtue of such authority*, unless it can be proved that the party discounting the bill, at the time of so doing, or before, saw the authority or knew of it, and discounted the paper upon the faith of that authority. In *Coolidge vs. Payson*, at page 75, the court say: "Upon a review of the cases which are reported, this court is of opinion, that a letter written within a reasonable time, before or after the date of a bill of exchange, describing it in terms not to be mistaken, and promising to accept it, is, if shown to the person who afterwards takes the bill on the credit of the letter, a virtual acceptance, binding the person who makes the promise." In a former part of the opinion, the learned chief justice states, that a promise to accept is considered as an acceptance, because it gives credit to the bill, and may induce a third person to take it. And if the letter is not shown, its contents can give no credit to the bill; but if shown, a promise to accept will give all the credit to the bill which a full confidence that it will be accepted can give.

This prayer places the responsibility of the party giving authority to draw, upon the ground, that the party discounting either saw it or knew of it. For the purpose of being more explicit, we deem it proper to say, on the subject of knowledge, that where an authority is actually given, and the person discounting is informed of its existence, without his having seen it, and discounts the paper upon the credit of the authority, then the promise to accept is equivalent to an acceptance, where the authority has been properly complied with. In *Coolidge vs. Payson*, the letter had been seen, and that appearing affirmatively, was held sufficient. That being the point in the case, there was no necessity to decide, that no knowledge

short of what was derived from seeing the letter would be sufficient. If such a letter is actually written and a person who is informed of its existence, without having seen it, thinks proper to rely upon such information, no injury is done to the writer. He is only bound to fulfill the promise he has made. And when a person is told there is a letter of this description when, in truth, there is none, if he acts upon the belief of what he has heard, he will be the loser and not the reported writer.

For the reason assigned in regard to the first prayer, we think the court were right in rejecting the third and fourth. They leave out of view, entirely, all consideration of any subsequent ratification of the transaction, with a knowledge of the circumstances.

By the fifth prayer the court were asked to instruct the jury, "that at the time of the plaintiffs' discounting the draft in controversy, the only promise of Lewis to accept, which is disclosed by the testimony, was contained in the letter of April 10th, and was a conditional one." There certainly was not a particle of evidence to prove any other promise to accept, at the time alluded to, except that contained in the letter, which, in our opinion, was clearly a conditional promise, and therefore the prayer should have been granted.

The sixth and seventh prayers are so very similar in principle, that they were jointly considered, by the counsel for the appellant, in argument, and we are disposed to pursue the same course. Both these prayers, virtually, contain the proposition, that the authority given to Robinson by Lewis to draw on him, was given for certain purposes and on certain conditions, disclosed in the letter of 10th of April 1849, which had been seen by, or was made known to, the plaintiffs, before they discounted the draft, and that they could not recover under the circumstances disclosed in the evidence, unless, as stated in the sixth prayer, "the defendant subsequently waived his right of objection;" or unless, according to the seventh prayer, "these conditions were subsequently waived, or their non-performance consented to by the defendant." It may be, that in point of fact the defendant never did waive his right of

Lewis *vs.* Kramer and Rahn.

objection, or consent to the non-performance of the conditions contained in his letter, and that consequently he was not liable as acceptor, yet if he received the sum of $550 from the plaintiffs, through Robinson, with a knowledge that this money was raised upon the draft in controversy and sent to him, with the expectation and belief, that if he received and retained the money he would accept the draft, then it would have been error in the court to have granted those prayers. We do not mean to say there is evidence which must have convinced the jury, that the defendant received the $550, with the knowledge and under the circumstances just stated; but there is evidence in the record, legally tending to prove such to be the case.

The authority to draw on Lewis, contained in his letter of the 10th of April, was designed to effect the payment of the note falling due on the 16th of that month, when it became due. And this not being done, the defendant had a right to decline accepting the draft; or in other words, the condition on which he promised to accept not having been complied with, he could not be held bound, *as acceptor* of the draft, by virtue of that promise.

And as the sum received by him was less than the amount of the draft, his retaining the money, with a knowledge of the circumstances, did not amount to a waiver of his right to decline accepting the draft. *Story on Prom. Notes, secs.* 281, 282 and 287. But if he knew that the note had not been paid, and that the $550, received by him, had been raised upon the draft and sent to him for the purpose of procuring his acceptance, with the expectation that he would accept, he was bound to return the money if he determined not to accept the draft. And if the jury did believe from the evidence, that the money was received and retained under such circumstances, a verdict might properly have been rendered against the defendant under the money counts in the nar.

The necessity of a demand upon the maker of a promissory note, so as to render the endorser liable, as such, to the holder, may be waived or dispensed with by the former. Receiving from the maker a sum of money sufficient to meet the note, or taking ample security as an indemnity for the same, will

amount to a waiver of due presentment. *Story on Prom. Notes, sec.* 281. *Duvall vs. The Farmers Bank of Maryland,* 9 *G. & J.,* 47. But receiving a sum less than the amount of the note, will not, necessarily, operate as a waiver. Nevertheless, the insufficient sum so received "may be recovered by the holder against the indorser, as money had and received to his, the holder's, use, *pro tanto,* in discharge of the note." *Story on Prom. Notes, sec.* 287.

Applying the principle of this authority to the present case, these prayers were properly rejected. Admitting the facts on which they were predicated to be entitled to full credit, the court could not say to the jury, the plaintiffs had no right to recover, unless the conditions were waived or their non-performance consented to by the defendant. For even if there was no such waiver or consent, the testimony in the cause tended to prove a condition of things, which, without the waiver or consent, rendered the defendant liable to the plaintiffs. But in speaking thus of the testimony, we wish to be understood as not intending to intimate, in the slightest degree, any opinion as to the influence which that testimony ought to have upon the jury, when considered in connection with all the proof in the case.

In regard to the right of the plaintiffs to maintain the money counts, in addition to the reference to *Story on Prom. Notes,* see 3 *H. & J.,* 370. 1 *H. & G.,* 265, and 3 *G. & J.,* 375, *Penn vs. Flack and Cooley.*

The eighth prayer asked an instruction to the jury, that the plaintiffs were not entitled to recover, if the jury believed that when Lewis received from Robinson the $550, Robinson was his debtor to more than that amount, upon a note then due and unpaid; and should also believe that Lewis applied the money to said debt, and did not intend, by said application, to ratify the act of drawing upon him by Robinson.

From what has been said in relation to the sixth and seventh prayers, it may be very readily be perceived, that we do not consider it essential to the right of the plaintiffs to recover, that the defendant *intended,* by the application of the money in the manner stated, to ratify the draft. If he received and re-

tained the money with the knowledge and under the circumstances already mentioned, then it matters not what might have been his *intention* in regard to ratifying the act of drawing upon him, at least so far as relates to the right of the plaintiffs to a verdict under the common counts. We therefore concur with the court below in the rejection of the eighth prayer.

The ninth prayer has been abandoned by the defendant's counsel.

The tenth prayer is, "that if the jury believed the letter written by Lewis, dated the 10th April 1849, authorized Robinson to draw a bill on him, dated the 10th of April 1849, for $583.09, and that instead of a draft bearing that date, one was drawn, dated the 16th of the same month; and if they further believed, that the figures in the authority to draw were altered from the 10th to the 16th, either by Robinson or by the plaintiffs, without the knowledge or consent of the defendant, then the plaintiffs were not entitled to recover, although the jury believed that Robinson received of the plaintiffs, for the draft in question, a check for the sum of $556 on the Exchange Bank, which he took to said bank and procured in bank notes, and afterwards went to another bank and obtained for the same a certificate of deposit for $550, which he sent to the defendant, in his letter of 18th April 1849, unless the jury should believe, that at the time when the defendant received the sum of $550, he was apprised of the fact of the alteration in such date." This prayer was also refused and we think properly so. Admitting the facts on which the prayer is based to be all true, and that the defendant did not know of the alleged alteration when he received the money, still he would have been liable under the money counts, if he received the money under the circumstances stated in the former part of this opinion, as being sufficient to give the plaintiffs a right to recover under those counts.

It is perfectly plain, that when the letter of April the 10th was written, Lewis intended giving Robinson authority to draw on him for the purpose of raising funds to pay the note in bank falling due on the 16th, for $583.09, so as to prevent

the note from being protested. The letter of the 18th April from Robinson to Lewis, which enclosed the money or certificate of deposit for $550, gave the latter information that the note had not been paid but protested; and that the money had been sent to him to be applied to the note. The letter contains the following statement: "I telegraphed you of this being posted, so that you would know how to act when the note comes back to hand. The protest I will include." And by way of postscript is added: "John Snyder, Esq'r, cashier of this bank, told me to-day, that numbers of parties here could not procure any par funds to meet their notes, and such they have to enter upon protests; and he even did not want to give me the certificate of deposit until I explained to him it was for that note returned." The alteration of the date alluded to, if true, and not known to the defendant, would discharge him from liability, as acceptor, under the written authority. But what justice would there be in holding, that the alteration in the date, without his knowledge, would of itself release him from the equitable claim of the plaintiffs under the common counts, if the jury should believe he actually received and retained the money, knowing it to have been the proceeds of the draft discounted, and those proceeds sent to him to be applied toward the payment of the same note which he designed should be paid by means of the draft authorised by him, on which note the defendant was responsible? If the money had not been received, the alteration, under the circumstances relied upon in the prayer, would have released the defendant from any responsibility.

The defendant's eleventh prayer was granted.

After rejecting all the prayers of the defendant except the eleventh, the court gave an instruction as a modification of the first and second. In this instruction there is error, because the court have assumed, as a fact, that the defendant "received the sum of money mentioned in the letter of Robinson." The late Court of Appeals, and the present also, have decided several times, that no matter how clear and satisfactory the testimony may be for the purpose of establishing any fact, the

court have no right to assume it to be proved, because by so doing the rights of the jury are interfered with.

We agree with the court below in the propriety of rejecting the first, third, fourth, sixth, seventh, eighth, ninth and tenth prayers; but we think there was error in refusing the second and fifth, and also in the instruction given as a modification of the first and second prayers. The judgment, therefore, will be reversed.

*Judgment reversed and procedendo awarded.*