# SAMUEL E. HOOGEWERFF *vs.* FRANK H. FLACK.

*Evidence—Entries in Account Book—Liability of Broker for Failure to Deliver Stock Purchased for Another—Default of Sub-Agent—Instructions—Gaming Contract.*

Entries in a ledger are not admissible in evidence unless it be shown that they were original entries by the testimony of the party who made them or by proof of his handwriting, if he be dead or out of the jurisdiction.

When an account book has been improperly admitted in evidence against the objection of a party, he does not waive his objection by making use as evidence of some of the entries in the book.

When one agrees to purchase shares of stock for another, who pays him part of the price upon being informed that the purchase has been made, such agent is liable for the acts and omissions of a broker employed by him to make the purchase and to whom he entrusted the control of the stock without the assent of his principal.

In an action to recover the amount paid on account of the purchase of shares of stock which were not delivered, it is proper to instruct the jury that if they shall find that the transaction was not intended by all parties to be an actual sale and delivery of the stock but that they only contemplated a payment at final settlement of the difference between the nominal purchase price and the market price at the date of such settlement, then the plaintiff is not entitled to recover.

Defendant agreed to purchase for plaintiff two hundred shares of the stock of a copper company at a designated price. Soon afterwards defendant notified plaintiff that the purchase had been made and asked for payment on account. Plaintiff made to defendant payments at different times until about half of the value of the stock had been settled for. Defendant had given the order to buy the stock to a firm of brokers, to whom he paid the money received from the plaintiff, but plaintiff had no knowledge of the manner in which the purchase was made. On the books of the firm the transaction was with the defendant. This firm failed and the stock was wrongfully sold out when amply protected by the margins deposited. Plaintiff alleged his readiness to pay the balance due on the purchase and sued to recover damages for defendant's failure to deliver. Defendant offered evidence to show that the contract when first made did not contemplate any delivery of the shares but was a margin transaction to be closed by the settlement of differences. Plaintiff on the other hand testified that the defendant agreed to make an actual purchase of the stock for plaintiff. *Held*, that there was no legally sufficient evidence in the case that the stock was to be paid for by plaintiff in installments; and it was therefore error to instruct the jury that if they found that the agreement was that the plaintiff should make payments from time to time to the defendant until the stock was fully paid for, and if the plaintiff called for the delivery of the stock and held himself ready and willing to pay the balance in full of the purchase price and that the defendant refused to deliver the stock, then the plaintiff is entitled to recover the amounts he paid to the defendant.

*Held*, further, that while defendant could rightfully employ a broker to make the purchase without the assent of the plaintiff, he could not by so doing relieve himself from the obligation to keep control of the stock so as to enable him to deliver the same to the plaintiff when demanded upon payment of the price, and that plaintiff is entitled to recover the amount paid to the defendant.

Appeal from the Superior Court of Baltimore City (Dobler, J.)

*Plaintiff's 3rd Prayer.*—If the Court, sitting as a jury, finds that the plaintiff authorized the defendant as his agent to purchase said stock for him, and if it finds that the defendant did

purchase said stock through Morrison & Company in his own name, without the knowledge, assent or subsequent ratification of the plaintiff of the purchase in such manner and if it finds from the evidence that the defendant did not make the payments on account of said stock as and when made by the plaintiff to him, then the plaintiff is entitled to a verdict for the amount of money paid by the plaintiff to the defendant. Granted in connection with the defendant's third prayer.

*Defendant's 2nd Prayer.*—That the defendant had, so long as he exercised good faith in the matter, entire discretion, as to where and from whom he should purchase the stock in question in this action, and inasmuch as there is no evidence that he did not exercise good faith in purchasing the same from or through E. N. Morrison & Co. (if the Court shall find it was so purchased) and inasmuch as by the uncontradicted evidence in this case defendant paid over on account of such purchase to E. N. Morrison & Co. all the money he received on that account from the plaintiff on that account, the plaintiff, under the pleadings in this action, is not entitled to recover and the verdict must be for the defendant. (*Rejected.*)

*Defendant's 3rd Prayer.*—If the Court shall find from the evidence that the transaction in question was not intended by all the parties thereto to be an actual sale and delivery of the stock in question, but that they only contemplated a payment at final settlement of the difference between the nominal purchase price and the market price at the date of such settlement, then under the pleadings in this case the plaintiff is not entitled to recover and the verdict must be for defendant.

*Defendant's 3rd Prayer as modified.*—If the Court shall find from the evidence that the transaction in question was not intended by all the parties to this suit to be an actual sale and delivery of the stock in question, but that they only contemplated a payment at final settlement of the difference between the nominal purchase price and the market price at the date of such settlement, then under the pleadings in this case the plaintiff is not entitled to recover for any sums paid by the defendant in accordance with the direction of the plaintiff. (*Granted.*)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John J. Donaldson* (with whom was *James A. Latane* on the brief), for the appellant.

There is no proof whatever that the book in question was a book of *original* entry. No witness was called who had made the entries or any part of them. Nor was any evidence offered to prove that they were in the handwriting of a clerk or book-keeper of the firm, and that such clerk or book-keeper was dead, insane or out of the State.

The evidence in question was not offered for the purpose of refreshing the memory of a witness, nor if it had been, was the proper foundation laid by showing that the entries in question were contemporaneous memoranda. This could only be shown by *one who made them or saw them made*, or read them at the time they were made. *Green* v. *Caulk*, 16 Md. 572, 573.

That entries, to be admissible at all, must be proved by the clerk who made them, has been again and again held by this Court. *Owings* v. *Low*, 5 G. & J. 134. As was the law in England *Cooper* v. *Marden*, 1 Esp. 1. Proof of his handwriting gratified this requirement, if he was dead or insane. *Clark* v. *Magruder*, 2 H. & J. 66; *King* v. *Maddux*, 7 H. & J. 467; *Reynolds* v. *Manning*, 15 Md. 523; or out of the State· *Heiskell* v. *Rollins*, 82 Md. 14.

But a witness cannot testify with reference to entries made by another of which witness had no knowledge other than that arising from the course of business of his employer. *Owings* v. *Low*, 5 Gill & J. 134; *Lewis* v. *Kramer & Rahn*, 3 Md. 287–8. However made, to be admissible at all, they must be original entries. *McCann* v. *Sloan*, 25 Md. 588; *Thomas* v. *Price*, 30 Md. 483–4; *Green* v. *Caulk*, 16 Md. 556; *Stallings* v. *Gottschalk*, 77 Md. 429, 435; 2 *Wigmore on Evidence*, sec. 1558.

The conclusion of the plaintiff's first prayer is absolutely inconsistent with the beginning (and indeed with the pleadings

and all the evidence in the case) treating the purchase as one from the defendant direct and *not* (as in the first part of the prayer) as a purchase by defendant as plaintiff's broker or agent from a third party.

As the seller was a third paaty, the defendant, as broker or agent, might well fail, without any default on his own part to procure delivery from the seller. The prayer as granted makes the broker or agent of the buyer responsible for the seller. We submit that in the absence of a special contract, founded on a legal consideration, there can be no such responsibility.

An agent incurs no personal liability to his principal in respect of any contract entered into by him on the principal's behalf, and in pursuance of his authority, unless he is acting on a *del credere* commission. *Bowstead on Agency*, 126; *Varden* v. *Parker*, 2 Esp. 710; *Alson* v. *Sylvester*, 1 C. & P. 107. Of such *del credere* agents the liabilities have been clearly laid down by this Court. *Lewis* v. *Brehme*, 33 Md. 412; *Miller* v. *Lea*, 35 Md. 396. That the agency here was not of that character there is no pretense.

When plaintiff ordered defendant to buy the stock for him, the defendant as broker, had an entire discretion as to the place where and the person from whom the same should be bought, so long as this discretion was exercised in good faith for the interest of his principal. *Billingslea* v. *Smith*, 77 Md. 504, 513–14.

That in this instance, this discretion was so exercised is proved without contradiction. The firm of E. N. Morrison & Co. at the time the order was placed with it, was of the highest standing and credit. As fast as margins were called by Morrison & Co. on account of the puichase, they were put np by the defendant, and up to the time of that firm's failure, there had been no default in this respect. Not content with this, the defendant, in excess of his legal obligations as a broker, as soon as he learned that the affairs of Morrison & Co. were doubtful, made arrangements to take up *with his own funds* plaintiff's stock, but on application to Morrison & Co., discovered that it had been sold out by that firm.

This first prayer of plaintiff is accordingly radically defective, in that it ignores all these uncontradicted facts, and makes the defendant liable for non-delivery to plaintiff of the stock, a non-delivery caused (as shown by the uncontradicted evidence), by the *illegal* closing out of the deal by Morrison & Co., in spite of every effort made by the defendant to protect it. That a prayer thus ignoring material facts is erroneous, has been repeatedly held by this Court. *Riggin* v. *Patapsco Ins. Co.,* 7 H. & J. 279; *Bosley* v. *Ches. Ins. Co.,* 3 G. & J. 450; *Adams* v. *Capron,* 21 Md. 205; *Haines* v. *Eppley & Pearce,* 41 Md. 234; *Chew* v. *Beall,* 13 Md. 348; *R. R. Co.* v. *Porter,* 19 Md. 458; *Schillinger* v. *Dratt,* 25 Md. 49; *Cook* v. *Carr,* 20 Md. 403; *Folk* v. *Wilson,* 21 Md. 538; *B. & O. R. R. Co.* v. *Boteler,* 38 Md. 568; *Roddy* v. *Finncgan,* 43 Md. 490; *Corbett* v. *Woolford,* 84 Md. 426; *Keedy* v. *Moats,* 72 Md. 330; *Andrews* v. *Clark,* Ibid. 433; *Crawford* v. *Bell,* 21 Md. 257; *Cal. Ins. Co.* v. *Traub,* 80 Md. 223.

A party may, indeed, segregate facts offered in proof, and ask an instruction on them. But when so segregated, the conclusion arrived at in the instruction must be consistent with the other facts offered in evidence. *Winner* v. *Penniman,* 35 Md. 163, 168 and cases above cited.

The plaintiff's first prayer is further defective, in that it lays down an erroneous measure for damages. It is predicated on a failure to deliver 200 shares of stock on tender of the balance ($4,800) of the purchase price. This Court has fixed the rule of damages in an action for non-delivery of stock bought. The value of the stock at the time of delivery (or as in this case of demand), with interest to the time of trial is the true measure of damages in an action for non-delivery. *Andrews* v. *Clark,* 72 Md. 396, 440.

Under the special contract declared on by the plaintiff, delivery by defendant of the stock at the time of demand, would have been a complete performance; and hence its then value, less the $4,800 still due by the plaintiff (with interest on the balance to trial, in the Court's discretion), can be the only measure of damages.

Even if the prayer be founded on the right of plaintiff on breach of defendant, to disaffirm the contract and sue for the money paid him in an action for "money had and received," the measure of damage given is erroneous. While the amount paid by plaintiff is the extreme limit of recovery, yet the defendant is entitled to credit against this of the difference between that sum and the value of the stock when it should have been delivered. *Dutch* v. *Warren*, fully cited by LORD MANSFIELD in *Moses* v. *McFerlan*, 2 Burr. 1010–12. And approved by this Court in *Murphy* v. *Barron*, 1 H. & G. 258, 265–66.

In other words, the Court will not allow a plaintiff, by disaffirming a special contract and suing on a general *assumpsit* to recover more than he could on the special contract. Or, as it has been put by this Court, in such a case, though the form of action be a general *assumpsit*, the measure of damages will be the rate of recompense fixed by the special contract. *Appleman* v. *Michael*, 43 Md. 269, 282; *Walsh* v. *Jenvey*, 85 Md. 240, 243–4; *R. W. Co.* v. *Basshor*, 82 Md. 397, 407; see also *Pinkney* v. *Dambmann*, 72 Md. 173.

The defendant also specially excepted to the first prayer of the plaintiff on the ground that there was no legally sufficient evidence that defendant did not apply all the moneys received by him on account of the purchase of the stock in question to that purpose.

The defendant's third prayer as offered, ruled, to put it shortly, that if the matter were found from the evidence to be a gambling transaction, the plaintiff was not entitled to recover.

The prayer, as modified and so granted, allowed the plaintiff, *even if the matter were a gambling transaction*, to recover any sums that defendant had not paid over to Morrison & Co.

It is submitted that the prayer as offered embodies the law as· laid down in frequent decisions of this Court, and that those decisions give no justification for the modification made by the lower Court. *Burt* v. *Meyer*, 71 Md. 467. This case was approved in *Billingslea* v. *Smith*, 77 Md. 504, 519. And these

cases are entirely in accord with the decisions of the U. S. Supreme Court. *Higgings* v. *McCrea*, 116 U. S. 671, 684–6; *White* v. *Barber*, 123 U. S. 392, 424–5.

*Richard B. Tippett & Brother*, for the appellee, submitted the cause on their brief.

The defendant contends that he was merely an agent to purchase the stock from some one else and that Flack knew or ought to have known that. Under this theory we have to say that as the defendant undertook the purchase of the stock he was bound to adhere faithfully to his instructions, and he was bound to apply the moneys paid towards the purchase price of the stock in a direct and accurate manner and the application by him of the moneys given by Flack to his own credit in his general individual account with Morrison & Co. was an absolute violation of the terms of the trust resting upon him, and even if he expected to make no charge for making the purchase, yet, having undertaken so to do he is still liable for any loss resulting from a departure from his duties. Even assuming for the sake of the argument that Hoogewerff had to buy the stock through another broker, good faith required him to buy it for the account of Flack and to apply Flack's money to that end. The defendant does not pretend that he ever purchased any stock for and in the name of Flack. Yet we do not have to consider that, for where an agent has violated instructions, the burden is upon him to show that his violation resulted in no substantial injury to the principal. *Adams* v. *Robinson*, 56 Ala. 586; *Wilson* v. *Wilson*, 26 Pa. 393. And on the general question of violation see *Williams* v. *Higgins*, 30 Md. 404, 408; *Middlekauff* v. *Smith*, 1 Md. 340; *Whiting* v. *Merchants' Express Co.*, 104 Mass. 152; *Short* v. *Skipwith*, 1 Brock. 103; *Walker* v. *Smith*, 1 Wash. U. S. C. C. Rep. 152; *Clark & Skyles Agency*, vol. 1, p. 384, and citations; *Meehem's Agency*, 474. From the foregoing it is seen that the granting of the plaintiff's third prayer in connection with the granting of the defendant's third prayer, as modified, is a correct exposition of the law.

The plaintiff authorized the purchase, as the testimony shows. When the purchase was made by the broker he rendered an account of the sales, as shown by the record to the plaintiff, and when he received $2,000 on account of the sales, he credited the plaintiff with the $2,000. The account of sales showed that Flack was indebted to Hoogewerff in the sum of $10,600. The moment that account of sales was rendered to Flack and he made the payment of $2,000 on account of it to Hoogewerff at that instant the relation of principal and agent changed and the relationship was that of debtor and creditor and the stock, if it had actually been in the hands of Hoogewerff, would have been held as collateral security for the payment of the balance of the purchase money. When a broker buys and renders a bill for the stock, the relation becomes that of debtor and creditor and the stock is held as collateral for the amount due. *Gruman* v. *Smith*, 81 N. Y. 26. And apart from any authority on this question it would appear to be the common sense view to take of the case.

Jones, J., delivered the opinion of the Court.

This case was instituted by the appellee against the appellant in the Superior Court of Baltimore City upon a declaration consisting of the common counts and a special count as follows: "For that the defendant was and is a stock broker, and on or about the — day of August, 1903, agreed with the plaintiff to purchase for and deliver to the plaintiff two hundred shares of the stock of the Amalgamated Copper Company at the price of $53 per share and the plaintiff delivered to the defendant the sum of $5,800 with which to make said purchase as part payment of the purchase price, to wit, $10,600, and the plaintiff stood and has always been ready and willing to turn over and deliver to the plaintiff the balance of the sum necessary to pay in full for said shares of stock, to wit, the sum of $4,800 upon their purchase by the defendant, but the plaintiff says that the defendant has neglected and refused to deliver to the plaintiff the shares of stock purchased or to be purchased by him and has utterly failed to comply

with his obligation under said contract whereby the plaintiff has been much damaged and claims $8,000 damages."

The appellant pleaded *non-assumpsit*, and not indebted, and three additional pleas to the special count in the plaintiff's declaration. The first of these traversed the said count. The other two are summarized in the brief of the plaintiff as follows: "(2) that defendant was not a stock broker in the city of Baltimore, nor a member of stock exchange in said city, and was not a member of the stock exchange in the city of New York; that Amalgamated Copper stock was not dealt in at the Baltimore exchange and had to be bought, as plaintiff well knew, through a broker who was a member of a stock exchange in some other city where said stock was dealt in; that accordingly defendant placed plaintiff's order with E. N. Morrison & Co., members of the New York stock exchange; that from time to time E. N. Morrison & Co. in accordance with the rules of said exchange, called upon defendant for certain sums of money as "margins" on said stock, whereupon defendant called on plaintiff for such sums, and at once on receipt thereof paid the same over to E. N. Morrison & Co. and that defendant never received any sum or sums from plaintiff other than those so as aforesaid paid over to Morrison & Co.; and (3) that the alleged contract was not a genuine purchase and sale, but merely contemplated a settlement of differences, and that all money received by defendant was by him applied to the purpose for which plaintiff had delivered it to him." In his replications filed thereto the appellee traversed these special pleas and issue was joined thereon. The trial of the case resulted in a verdict and judgment against the appellant (defendant below) and he has brought this appeal.

The questions presented for decision here arise upon two exceptions—one relating to the action of the trial Court in ruling upon the admissibility of evidence—the other to the rulings upon the prayers. There can be but little difficulty in disposing of the question raised by the first exception. It arose upon the offer in evidence by the plaintiff, in the course of the trial, of a ledger kept by the brokerage firm of E. N.

Morrison & Co. and certain accounts therein pertaining to deal-
ings of the appellant (defendant below) with that firm. The ap-
pellant was being examined as a witness on his own behalf and
upon cross-examination frequent references were made by the
examining counsel to the book in question. Before the con-
clusion of the cross-examination the same was suspended, and
a clerk in the employ of E. N. Morrison & Co. was called by
the appellee as a witness with the view of laying a foundation
for the offer in evidence by the appellee of this ledger and the
accounts. This witness was asked. "State whether the book
marked Ledger No. 5 Morrison & Co. which I hold in my
hand was the official ledger of the firm of Morrison & Co."
Answer. "It is one of their books. Q. Is it one of their
official ledgers showing transactions in their business? A. Yes
sir; we call all the ledgers official. * * Did you make any
of the entries? A. I doubt if you will find my handwriting in
that book once. Q. What was your business? A. I was in
the front office getting business, and I was in charge of the
margins. Q. Do you understand the business of this com-
pany? A. Yes sir. Q. Do you understand these accounts?
A. Yes sir. Q. Do you know that Mr. Hoogewerff (appel-
lant) carried an account there? A. Yes sir. Q. What ac-
count is this on page 10 if you know? A. The account of S.
E. Hoogewerff. Q. Is that a general or special account or
what? A. That is no special account at all; he had no spe-
cial account. Q. What was this account? A. His regular ac-
count, and he had an account No. 2. Q. And the account
No. 2 was found on page 580? A. Yes sir. Q. You are
familiar with that account? A. Yes sir."

The record then states "The plaintiff thereupon offered in
evidence the ledger mentioned in evidence and the following
accounts therein." To this appellant objected and his objec-
tion was overruled and the evidence admitted. The witness
then upon cross-examination by appellant's counsel was asked
if he had anything to do with the making of entries in that book
and answered "No;" that he might have put some entries in
it when some of the other book-keepers were sick but it was

not his regular work.   He was asked further what he knew about the correctness of the book and said he could only say the books were balanced up at certain periods and they were proved; and then what he knew as to the correctness of the charges or the crediting of the various items between the two accounts of the appellant, and said that he knew nothing of that; that appellant may have given an order on one account and it may have been credited on another; that as far as that went he did not recollect it; or he (appellant) might have told them "to put this on the wrong account;" he could not remember.   It will be observed that the ledger in question and the entries therein were offered and admitted as original and substantive evidence of the facts indicated by these entries.

The foregoing statement of the testimony, preceding and introducing this offer of evidence, is sufficient to make manifest the error of its admission.   The entries in the ledger were not, or were not shown to be, original entries.   The witness did not make them nor see them made, and expressly disclaimed any knowledge or recollection that would enable him to speak of their correctness but on the contrary suggested how they might be inaccurate.   The principles, regulating the introduction of evidence of the character of that here in question, and determining its admissibility, have been so frequently explained and applied in our decisions and are so familiar in the text-books that it is unnecessary to restate them here. Their application in sustaining the view we here express in ruling upon the exception, we are considering, will be sufficiently enforced by a reference to the cases of *Owings, &c.,* v. *Low,* 5 Gill & John, 153; *Lewis* v. *Kramer, &c.,* 3 Md. 265; *McCann* v. *Sloan,* 25 Md. 575–588.

We cannot regard the admission of this evidence as nonreversible error as we understand the appellee to argue.   It is very evident that the appellee thought that the entries in question afforded inferences going to the vital questions in the case; and, assuming them to have been properly in the case, they were, certainly, from the appellee's standpoint, not unimportant in view of the issues that had been made up under

the pleadings.  The appellant questioned the accuracy of the entries—certainly did not admit that they correctly represented the facts.  He explained how he was without efficient means of contradiction because all of his own memoranda relating to the subject of the entries had been destroyed in the fire which had recently reduced to ruin a large section of the city of Baltimore,  Under the  circumstances the appellant could properly insist that the evidence in question sought to be offered against him, should be so offered under the safeguards which the  law  wisely provides  shall attend the introduction of evidence of this character, unless he had, in some manner, waived his right in this regard, or estopped himself from asserting it.

It seems to be supposed that he waived this right because he had brought the book into Court and submitted to be questioned in regard to it in the cross-examination.  If he was responsible for the physical presence of the book in Court he did not offer it in evidence, and could not have done so, against objection, without laying a proper foundation therefor. In his examination in chief as a witness there was no attempt to use the book nor any entry in it as evidence; and as far as appears from the record, as soon as the offer was made to introduce the book and its entries as evidence *per. se* the appellant's objection was made.  It is further argued that appellant ought to be held as having waived objection to the admissibility of the evidence in question because of the reference to, and use made of, certain entries in the book in question by his counsel.  But this was after the book had been admitted in evidence against the objection of the appellant; and was apparently in the way of rebuttal.  The appellant had the right then to make reference to any proper matter of rebuttal afforded by the entries and cannot be held to have forfeited any other right because of exercising this.  If the matter made use of by the appellant in this connection was not competent evidence in the cause it could have been excluded by seasonable objection.  The ruling of the Court below in the first exception must be reversed.

Now remains the exception to the ruling upon the prayers. The plaintiff offered four prayers and the defendant (appellant) three. Of these the Court granted the first and third of the plaintiff's and rejected the second and fourth. The third of the plaintiff being granted in connection with the third of the defendant's as modified by the Court. The defendant filed special exceptions to the first and third prayers of the plaintiff which were overruled. The Court granted the first prayer of the defendant, rejected the second and modified the third and granted it as modified.

The first prayer of the appellee after its preliminary recitals is as follows "and requested the defendant to purchase for the plaintiff two hundred shares of the capital stock of the Amalgamated Copper Company, at and for a price not exceeding $53 per share, with the understanding and agreement that if the stock was so purchased at said price for the plaintiff, that the plaintiff should pay on account of said purchase price the sum of $2,000 and make such other payments from time to time as might be required by the defendant until said stock was fully paid for; and if the Court, sitting as a jury, shall further find that the defendant did on or about the 7th day of July, 1903, notify the plaintiff that he had purchased said stock at said price, and that the plaintiff, on or about the 7th day of July, 1903, paid on account of said purchase price to the defendant the sum of $2,000 and thereafter made payments on account of said stock as demanded by the defendant amounting to $5,800; and if the Court shall further find that after making said payments the plaintiff called for the delivery of said stock to him and held himself ready and willing to pay the balance in full, with interest thereon for said stock at the price at which it had been purchased and that upon said offer the defendant declined or for any reason refused to deliver the stock to the plaintiff, then the plaintiff is entitled to a verdict of $5,800 with interest, in the discretion of the Court."

The appellant filed special exceptions to this instruction assigning as one of the grounds therefor that there was, in the cause, no legally sufficient evidence that the stock in question

was to be paid for in installments as the prayer assumed. The prayer was clearly obnoxious to this objection. The theory of the plaintiff (appellee) as to the transaction, between him the defendant (appellant) was that it was an outright purchase of the stock that the appellant was to make with a view to an actual delivery thereof to him (appellee) when he should pay the purchase price of the same. The theory of the appellant was that it was to be a purchase upon margin and not intended to be consummated by a delivery of the stock; but, in the parlance of the stock exchange, by a "settlement of differences" which is now well enough understood not to need to be here explained.

The appelle's *narr.* affirmed that the appellant "agreed with the plaintiff to purchase for and deliver to the plaintiff two hundred shares," &c. In support of his theory and the averment of the *narr.* the appellee's testimony as a witness in his own behalf, was that on the 6th of July, 1903, he was at the office of the appellant in Baltimore City where he was led to believe, from what he saw, and from his interview with the appellant, that the latter was carrying on a brokerage business, and while he was looking over the stock board that was up in the office having upon it quotations of the prices of stocks, &c., the appellant asked him what he (appellee) liked on the board, to which the latter replied that he liked copper; and followed this up by saying to appellant "if copper gets down to 53 I want you to buy me a couple of hundred shares," to which appellant replied "all right" and the next day sent him a letter that the stock had been bought and asked in the letter for a payment of $2,000 "on account" for which the appellee sent a check; that further payments were made to the appellant upon calls made by him as follows: July 16th, 1903, $1,000; 23rd of same month, $1,000; 23rd of October following, $1,000; and a payment of $800, the date of which appellee was unable to give. The appellee was asked by his counsel the direct question whether he had had any talk with the appellant before the stock was bought "as to how much money he (appellant) wanted" the appellee "to pay on account." To this

appellee replied "that was not mentioned." His attention was also called, by his counsel, to the plea of the appellant to the effect that the stock was to be bought on margin and asked what he had to say about that, to which the answer was, "there wasn't a word mentioned about that."

Now this evidence of the appellee, taken by itself, in proof of the contract between him and the appellant, and to support his construction of it, and his theory as to the transaction in controversy, makes the contract one in which the appellant assumed· the obligation to make an actual purchase of the stock named, at the price named, for account of the appellee; and when he had done this and reported it to the appellee he would have had the right to call upon the latter for an immediate payment of the purchase price—or at least to call for payment to be made within a reasonable time. The appellee would have been under a corresponding obligation to take and pay for the stock upon receiving notice of its purchase and the readiness of the appellant to deliver it. The appellee, as a witness, gave no other testimony, in chief, nor did he offer any otherwise, of any usage or custom or of anything to give to the contract any other effect. Upon cross-examination the appellee testified that he had had, previous to the transaction in question, with the firm of McDonald & Hoogewerff, a brokerage firm, of which the appellant was a member, other dealings in stocks—once in Steel and twice in Amalgamated copper—the description of stock which was the subject of the contract here in controversy—and in all of these instances the deals were carried by margins and finally consummated by a settlement of differences without any delivery of stock being made or called for. It also appeared that at the time of the order of the appellee to the appellant the stock ordered was selling above 53—the figure at which it was to be bought.

There was testimony on behalf of the appellant that the contract between him and the appellee was one to purchase the stock in question on a margin contract to be consummated as the other contracts, mentioned by the appellee in his cross-examination, had been. The fact then that the payments

thereunder were called for and made, as they are shown to have been, from time to time, went to support the theory of the appellant as to the nature of the transaction in question and was contradictory of the contract which the appellee's testimony had tended to show.    The instruction granted by the Court in this first prayer of the plaintiff deprived the appellant of the proper effect of this fact in the case upon his contention, because putting it to the tribunal that was to pass upon the facts to find that the plaintiff "requested the defendant to purchase for the plaintiff  *  *  *  stock  *  *  * at and for a price not exceeding $53 per share, with the understanding and agreement that if the stock was so purchased at said price for the plaintiff, that the plaintiff shall pay on account of said purchase price the sum of $2,000 and make such other payments from time to time as might be required by the defendant until said stock was fully paid for," was to instruct that, contrary to the fact of the payments for the stock having been made in the manner they were, going to support the contention of the appellant as to the character of the transaction in question, there was evidence to bear out the assumption that the plaintiff had made the payments in exact accordance with the terms of the contract and according to his strict contractual right.    This was done too by importing into the contract between the parties terms which upon the plaintiff's testimony and from the plaintiff's standpoint were not in it; and which he did not, in his testimony, claim to be in it; but which, it may be said, he repudiated.    For the reason given the special exception to the plnintiff's first prayer should have been sustained and the prayer refused.    It is not open to other objections urged against it.    It was framed upon a proper theory for a case such as this and it cannot be said that the Court ought to have refused it for a want of evidence otherwise than has just been indicated.

The appellant was not employed in the capacity, simply, of an agent to negotiate a contract between the seller of the stock and the appellee.    He undertook to purchase the stock and when this was reported to the appellee, and he was called

upon for payments on account of the purchase price this car-
ried with it the obligation, assuming the transaction to be a
*bona fide* one, according to the theory of the appellee, "to have
at all times in his name or under his control the shares pur-
chased or an equal amount of other shares of the same stock
and upon receipt of the amount due him thereon to deliver the
shares to the client or to sell them as the client may direct and
account to him for the proceeds." 26 *Am. & Eng. Ency. of
Law,* 1057; *Rosenstock* v. *Tormey,* 32 Md. 169. While the
appellant could, under the circumstances indicated in his
pleadings and in his proof, rightfully employ in the purchase
of the stock, the agencies that he did, so as to fix upon the
appellee the obligation to take and pay for the stock so pur-
chased, when called upon to do so (32 Md. 169, *supra*), he
could not, because of having employed such agencies in mak-
ing the purchase, relieve himself of the reciprocal obligation
to get and keep control of the stock so as to be able to de-
liver the same to, or dispose of it according to direction from
the appellee when the purchase price was paid and the stock
demanded, if we assume the truth of what the appellee affirms
in his pleadings and which he offered evidence to support
—the weight of the evidence being for the tribunal trying the
facts.

We do not agree either with the contention that the prayer
in question states incorrectly the rule of damages in a case such
as this. Here again must be assumed as true the matter affirmed
in the appellee's pleadings and in the evidence he adduces in
support thereof, then we think the fair rule applicable to the
right of a plaintiff to a recovery in a case of this character is
stated in the authority just quoted, 26 *Am. & Eng. Ency. of
Law,* 1066, as follows: "Where a broker does not obey his
client's orders in making actual sales and purchases, but re-
ports to him fictitious transactions, the client may recover from
the broker any money or other securities deposited as mar-
gins or any payments made to the broker in settlement of
such transactions." There can be no difference in principle
between a loss occurring to a client from conditions described

in the foregoing quotation and one occurring from a report to the client which leaves him under the belief that the stock has been purchased and is under the control of the broker employed when in fact it is under the control of others of whom the client knows nothing. In this case this latter condition was alleged and evidence offered designed to show it the weight of which, we may again repeat, is for the tribunal that tries the facts.

We do not understand the case of *Dutch* v. *Warren*, cited in *Moses* v. *McFerlan*, 2 Burr. 1010, and in *Murphy* v. *Barron*, 1 H. & G. 258, to have been adopted in this State as to the point to which it was cited. That case however was unlike the one at bar in that the transaction there was a direct trans-action between vendor and vendee. We do not mean there-fore to express any opinion here as to the authority of that case in a state of facts such as formed the basis of the decision therein.

It is not perceived how the hypothesis of fact in the appellee's third prayer could form a basis of recovery for the plaintiff. From what has already been said in passing on the first prayer the appellant had a discretion to purchase the stock in question, as he did, through the agencies he employed and in his own name—and he did not need the knowledge, consent or subsequent ratification of the appellee to so purchase. The appellee's order for the stock was without restriction as to the purchase of the same except as to price; and under the authority of *Rosenstock* v. *Tormey*, *supra*, the appellant had the discretion to execute the order as he did and there was no failure of duty in that regard. What appellant was responsible for was the control of the stock after the purchase was made. Such liability as attached to him arose from his not having control of the stock when it was demanded. As he had on him the risk of giving control of the stock to Morrison & Co. instead of retaining it himself it made no difference whether he paid over to that firm the monies he received from the appellee *"as and when"* payments were made to him by the appellee or not. If he had with Morrison & Co. all the

time the transaction was in progress sufficient to his credit to protect the stock with them and could have delivered the stock when called for his duty in that regard would have been performed; and he would have had the right to protect himself by calling upon the appellee for the necessary or proper amounts to that end, as the occasion arose, without immediately paying them over as the prayer by its terms required. For the reasons assigned the third prayer of the plaintiff ought to have been refused.

The reasoning leading to the conclusion reached in regard to the appellee's third prayer will require the affirmance of the rejection of the appellant's second prayer.　That the appellant exercised the discretion he had, as to making the purchase of the stock in good faith and paid over the monies received from the appellee to Morrison & Co. did not, upon the assumption made in passing on other propositions, of the truth of what is affirmed in the pleadings of the appellee, relieve the appellant of liability for not having control of the stock so as to deliver it when the price was tendered and the same demanded.　In other words a broker cannot, in the circumstances indicated, make a contract through a sub-agent which will in all respects be binding upon his customer; and at the same time shift to the sub-agent, to the relief of himself therefrom, the obligations, nor any of them, that the contract imposes upon him. We see no objection to the appellant's third prayer as modified by the Court.

It follows from the foregoing expression of views that the judgment below must be reversed.

> *Judgment reversed with costs to the appellant, and new trial awarded.*

(Decided June 20th, 1905.)